EXPERT WITNESS REPORT:

RANDOLPH MARTIN MD

CARDIOLOGIST, CARLE FOUNDATION HOSPITAL, URBANA ILLINOIS

CARLE ILLINOIS COLLEGE OF MEDICINE

Re: Dalynn Kee  dob: 07/24/98


**Qualifications:** I am a board-certified cardiologist practicing in Urbana Illinois. From 1989 through 2018 I practiced in Springfield Illinois. As an interventional cardiologist I have been involved in the care of a great number of patients with high-grade arrhythmias including survivors of sudden cardiac death syndrome, pulmonary edema, dehydration and renal failure. I have diagnosed and treated young patients with congenital heart disease, specifically obstructive cardiomyopathy and WPW syndrome*. I have performed over 7000 coronary angiograms and over 1500 stents. I have implanted pacemakers and defibrillators for most of my career. Since 1989 I have worked full-time as a clinical cardiologist. I have held teaching appointments at Southern Illinois University College of Medicine in the past, and Carle Illinois College of Medicine currently. I have taken part in the care of patients with drug overdose and I am familiar with symptoms of withdrawal. Consequently I consider myself qualified to review the records of this young lady and render the opinions set forth below.

**Records reviewed:**

1. Complaint

2. Complete autopsy report

3. Dr. Tim Martin expert report

4. Brandon Kee deposition transcript

5. Amanda Kee deposition transcript

6. Saint John's record for Dalynn Kee for emergency room visit dated March 17, 2016

7. Dr. Tim Martin deposition transcript

8. Forty four video clips of Dalynn Kee when she occupied the medical cell at the Macon County Jail.

9. Additional medical records from: Champaign treatment center, Springfield treatment center for methadone, Carle Foundation Hospital for pregnancy, Macon County jail, Decatur ambulance, HSHS Saint Mary's Hospital Decatur with toxicology report, HSHS St John's Hospital and Prairie Cardiovascular Consultants.

10. Medical cell video screen shots taken at 6:01 p.m., 6:22 p.m. and 6:35 p.m.

11. Nursing records of administered medications and the Macon County jail.

With this considered, I begin my report with the following definitions. Asterisked words in the text can be cross-referenced with this list as needed.

**Definitions:**

1. a) Acquired heart disease is far more common than congenital heart disease in the adult population. The most common of these include development of coronary artery blockages, thickening of the heart muscle due to hypertension, weakness of the heart muscle (cardiomyopathy) from many causes, development of Valvular heart disease and diseases of the electrical system.

   b) Congenital heart disease is, by definition, heart problems we may be born with, some of which can lead to sudden cardiac death. These essentially include familial (inherited) hypertrophic cardiomyopathy which is an abnormality that results in thickening of parts of the left ventricle. This is commonly known as "athlete's heart" and is associated with sudden cardiac death due to lethal arrhythmia during moderate to severe exercise. Additionally diseases of the electrical conduction system can be inherited such as Wolff-Parkinson-White syndrome or (WPW) and Brugada syndrome which, in rare cases, can also lead to sudden death.

2. Pulmonary edema: This term means congestion of fluid in the lung tissue. Most commonly seen in congestive heart failure in older patients, it can also be seen at autopsy in dehydration (article attached)

3. Kidney disease: Chronic kidney disease or CKD describes the level of kidney impairment. The glomerular filtration rate, GFR, describes how well the kidneys can filter toxins from the blood. There are 5 stages.

Stage I is normal with GFR greater than 90.

Stage II is mild kidney disease with GFR between 60 and 90.

Stage III is moderate kidney disease with GFR between 30 and 60.

Stage IV is severe kidney disease with GFR between 15 and 30.

Stage V is severe kidney disease that is end-stage which is when patients are close to or requiring dialysis.

4. Ejection fraction: This is the percentage of blood that the heart is able to expel with each contraction. Normal values are greater than 50%. Dangerous values are less than 30%.

5. Pacemaker versus defibrillator: A pacemaker is implanted to prevent the heart from going too slow in order to prevent the patient from passing out; it cannot shock the heart. It is almost exclusively used in acquired heart disease*. A cardiac defibrillator is implanted when the patient has a low ejection fraction* of any cause which subjects the heart to arrhythmia. A defibrillator provides an internal shock to the heart which restores normal rhythm; it can save lives. It is generally not used for congenital heart disease but rather acquired heart disease*.

6. Bulimia: A psychological illness wherein patients self-induce vomiting for the sake of weight loss due to a distorted body image.

7. Hypoxia: This is when the amount of oxygen in the blood available to all the body's tissues is decreased. There are many causes of this including respiratory depression due to drug overdose. At the extreme this can result in seizures and cardiac arrest.

Definitions:

1. a) Acquired heart disease is far more common than congenital heart disease in the adult population. The most common of these include development of coronary artery blockages, thickening of the heart muscle due to hypertension, weakness of the heart muscle (cardiomyopathy) from many causes, development of Valvular heart disease and diseases of the electrical system.

b) Congenital heart disease is, by definition, heart problems we may be born with, some of which can lead to sudden cardiac death. These essentially include familial (inherited) hypertrophic cardiomyopathy which is an abnormality that results in thickening of parts of the left ventricle. This is commonly known as "athlete's heart" and is associated with sudden cardiac death due to lethal arrhythmia during moderate to severe exercise. Additionally diseases of the electrical conduction system can be inherited such as Wolff-Parkinson-White syndrome or (WPW) and Brugada syndrome which, in rare cases, can also lead to sudden death.

2. Pulmonary edema: This term means congestion of fluid in the lung tissue. Most commonly seen in congestive heart failure in older patients, it can also be seen at autopsy in dehydration (article attached)

3. Kidney disease: Chronic kidney disease or CKD describes the level of kidney impairment. The glomerular filtration rate, GFR, describes how well the kidneys can filter toxins from the blood. There are 5 stages.

Stage I is normal with GFR greater than 90.

Stage II is mild kidney disease with GFR between 60 and 90.

Stage III is moderate kidney disease with GFR between 30 and 60.

Stage IV is severe kidney disease with GFR between 15 and 30.

Stage V is severe kidney disease that is end-stage which is when patients are close to or requiring dialysis.

4. Ejection fraction: This is the percentage of blood that the heart is able to expel with each contraction. Normal values are greater than 50%. Dangerous values are less than 30%.

5. Pacemaker versus defibrillator: A pacemaker is implanted to prevent the heart from going too slow in order to prevent the patient from passing out; it cannot shock the heart. It is almost exclusively used in acquired heart disease*. A cardiac defibrillator is implanted when the patient has a low ejection fraction* of any cause which subjects the heart to arrhythmia. A defibrillator provides an internal shock to the heart which restores normal rhythm; it can save lives. It is generally not used for congenital heart disease but rather acquired heart disease*.

6. Bulimia: A psychological illness wherein patients self-induce vomiting for the sake of weight loss due to a distorted body image.

7. Hypoxia: This is when the amount of oxygen in the blood available to all the body's tissues is decreased. There are many causes of this including respiratory depression due to drug overdose. At the extreme this can result in seizures and cardiac arrest.

8. Dehydration: This is when the body does not have enough fluid. The blood stream is the first part of the body to be affected as the lack of fluid results in concentration of many of its components. There are three terms to describe dehydration: Hypernatremic dehydration is when the sodium level goes up. Hyponatremic dehydration is when the sodium goes down. Isonatremic dehydration is when the sodium level is normal. In all three cases these patients are dehydrated. Please see attachment for further description.

9. Cyanosis: This is when the skin develops a blue tint due to accumulation of non-oxygenated blood; this results from hypoventilation.

10. WPW and Brugada syndrome: These are two distinct and potentially life threatening electrical disturbances of the heart that are caused by congenital anomalies which are inherited.

Decedent's clinical history prior to incarceration:

Dalynn Kee presented to the emergency room at St. John's Hospital in Springfield Illinois in the early morning hours of March 17, 2016. She was 17 years old at that time. She was taken to the emergency department by a friend who stated that Dalynn had become unresponsive sometime after she "took some medication". When hospital staff came out to the car she was pale and cyanotic*, and had agonal (slow) respirations. While seated in the car her pulse could not be definitely established and so CPR was initiated. She was removed from the car and brought to the emergency room on a stretcher during which time compressions continued; she was also administered oxygen via face mask. Within 30 seconds her color improved and she began breathing on her own and had a good pulse and blood pressure. Following placement of an IV she was given 2 mg of Narcan and within 15-30 seconds "regained full consciousness". She confirmed that she had taken heroin. In addition, a prescription bottle for clonazepam was found which she had filled at her pharmacy eight days prior. Of the thirty tablets dispensed there was only one left in the bottle suggestive that she may have overdosed on these pills as well which would further depress respirations and cause hypoxia*. During that emergency room visit the patient's electrocardiogram was completely normal. Specifically there was no evidence of congenital heart disease on this ECG, such as WPW or Brugada syndrome*. Her electrolytes were within normal range; her renal function was normal. She was kept under observation and released later that day with a diagnosis of acute heroin overdose. At no time was there any mention of arrhythmia.

Events of incarceration:

On October 7, 2019 the patient was arrested for failure to appear in court on a warrant previously issued. On that day she was incarcerated at the Macon County jail. At the time she had been enrolled in a methadone program. Her daily dose was 208 mg which is higher than average and indicates a strong dependency. At the jail she was told that she would not receive methadone during her incarceration but instead would be given a combination of hydroxyzine and clonidine along with Zofran for nausea. She received these medications between October 8th and October 10, 2019. She received only clonidine between October 11th and October 13, 2019. She did not receive medications between October 14th and October 16th with the exception of an emergency dose of Zofran at 9:16 p.m. on

October 16th. In addition she received a single dose of injected Zofran at 1:00 p.m. on October 17th. The court should note that hydroxyzine is an antihistamine which treats anxiety, nausea and vomiting as well as itching. Clonidine treats the hypertension that might occur during withdrawal. Zofran is an anti-nausea medicine. None of these medications are 100% successful.

The Clinical Opioid Withdrawal Schedule (COWS) is utilized at the Macon county jail via a written policy. It advises the following: That inmates can begin withdrawal within 72 hours of the last use, that symptoms may persist for up to ten days and that moderate symptoms of withdrawal include anorexia, vomiting, and diarrhea. It further states that severe symptoms result in agitation, tachycardia and restlessness. Additionally, that the inmate should be reassessed twice daily for the above symptoms as longer use or increasing dosages of these medications may be necessary. Lastly it states that inmates should be scheduled for substance abuse counseling and long-term treatment options.

On October 14th, the other inmates were complaining that Dalynn had been vomiting. On October 16th the jail's medical staff indicated that she had refused trays of food. This is consistent with developing anorexia. On October 16th Dalynn reported that she had been vomiting all day. At 8:30 p.m. she was moved to a medical cell. Over the following twenty hours, and until the time of her death, she vomited dozens of times. She attempted to drink fluid but was unable to keep it down. She had several episodes of diarrhea. Eventually she began to stagger. She fell down and became unresponsive. She appeared to have a brief seizure before going into cardiac arrest. She was pronounced dead on the evening of October 17, 2019 by the arriving emergency medical services team.


Autopsy:

On October 18, 2019 Dalynn underwent a complete autopsy. The following are the pertinent elements of this postmortem examination:

1. Brain changes consistent with cerebral edema

2. Pulmonary edema

3. Normal heart examination, grossly and microscopically

4. Kidneys showed evidence of cell death consistent with pre-mortem renal failure

5. Relevant toxicology and chemistry: Positive for naloxone, caffeine and THC. Sodium of 132. Potassium of 7.5. Chloride of 106. BUN 78. Creatinine 2.1 with BUN:Creatinine ratio of 37 which is consistent with dehydration and calculates to a GFR* of 29 cc/minute, consistent with stage 4 kidney disease.

Discussion:

Presentation to Saint John's Hospital on July 6, 2017: Following the overdose of heroin, Dalynn Kee developed severe respiratory depression causing all of her symptoms: Lethargy, nonresponsive state, slow respirations, cyanosis and a thready pulse. She was likely hypotensive as well. At no time was there evidence of a cardiac arrest. The performance of CPR by emergency personnel is not an indication of arrhythmia necessarily. When first responders do not detect a strong pulse they are expected to fear the worst and begin CPR. This activity is certainly not proof of any arrhythmia (which can only be documented with an EKG rhythm strip, which was not done during CPR). I have seen this presentation many times when CPR was done in an outpatient setting for *presumed* cardiac arrest. Secondly and even more importantly is when patients do suffer cardiac arrest *they do not wake up with alertness*. Rather they are lethargic, confused and do not "come around" for hours or even days. The record indicates that Dalynn immediately responded to naloxone, woke up and had normal cognition. So there was no cardiac arrest.

Because methadone was not available at the Macon County Jail Dalynn was started on the COWS protocol. The onset and severity of withdrawal symptoms is dependent upon the dose of methadone that was stopped. She was on over 200 mg which is higher than the average dose. It often takes months or years to be weaned off these doses. The COWS protocol that was initiated included the lowest dose of clonidine. While it may be reasonable to start at this low dose, it should be increased as symptoms persist; this was not done. Her vomiting and refusal of food pointed to the beginning of withdrawal symptoms. She was observed twice daily between October 8th through 13th, with no documentation of same until placed in the medical cell on October 16 where she continued to vomit frequently and became agitated. There was no intervention by medical staff despite an abundance of withdrawal symptoms. As a result of continuous vomiting and diarrhea she lost a large amount of fluid without replacement. As a result of this her kidneys failed. As a result of the kidney failure her potassium rose to a level of 7.5. This high potassium level, coupled with severe dehydration, precipitated a cardiac arrest which was her cause of death here.

Both Dr. Martin and Dr. Corey expressed the following opinions:

That Dalynn Kee had inherited a genetic cardiac mutation which made her susceptible to sudden cardiac death. And that both her mother and her maternal aunt similarly carried such a genetic pattern.

*This notion is not supported by any medical evidence. In fact, quite the contrary.*

1. The oral history provided by both Brandon and Amanda Kees' testimony is vague at best. They testified as to what they heard, but provided no documentation. As a medical consultant trying to gain history by family members their statements would carry no weight.

2. There is nothing in the Saint John's medical record to draw this conclusion. Her electrocardiogram was normal which rules out the presence of WPW or Brugada syndrome. There is no documentation of

arrhythmia at all. Finally, upon administration of naloxone she regained full cognition within 15-30 seconds as documented. This effectively rule out serious cardiac arrhythmia causing her non-responsiveness.

3. Regarding Dalynn's mother's presentation to the hospital as documented, the mere notion, as opined by Dr. Martin, that she "had syncope in her sleep" is actually a preposterous statement; it is actually meaningless. When a person is asleep, by definition, they are not awake. In 32 years I have never heard a doctor presume that someone had syncope in their sleep. Furthermore, there is nothing in the medical record from that hospitalization that alludes to a cardiac arrhythmia. In fact at her Cardiology follow-up with Prairie Cardiovascular Consultants she was told that her heart was normal.

4. Finally, the presentation of her aunt to the hospital must be taken at face value; speculation is not reasonable here. The patient had evidence of acquired heart disease* and not congenital heart disease*. Specifically she had coronary and valvular heart disease. Whether she received a pacemaker or a defibrillator is not clear nor is it relevant because it certainly would not have been placed for congenital heart disease.

Forensic Pathologist's report:

I am in complete agreement with the forensic pathologist. Dr. Nathaniel Patterson concluded that the cause of death was dehydration as a consequence of opioid withdrawal. This conclusion matches the clinical sequence of events of what occurred in the Macon County jail. Examination of the heart postmortem was unremarkable. There were no structural abnormalities found such as "athlete's heart" that would suggest a structural congenital cardiac condition.

Regarding the opinion set forth by Dr. Tim Martin my comments are as follows:

It appears that Dr. Martin relied on testimony of Amanda and Brandon Kee. In my reading of their depositions their statements suggest that they are unsure of the nature of the medical circumstances surrounding both their mother's and aunt's illnesses. The information they provide therefore is insufficient to link their medical conditions to the cause of Dalynn's death.

Further, on page 18 line 14 Dr. Martin points out that the aunt's need for a cardiac defibrillator is to prevent "sudden cardiac death". In her case the risk for sudden cardiac death was due to acquired heart disease and not congenital heart disease. In fact there is no documentation that the aunt even received a defibrillator as opposed to a pacemaker. Speculating that there was a "family gene" that the decedent inherited makes no sense.

Dr. Martin appears to have put some weight on the fact that the decedent's episodes of vomiting were self-induced. To this I make the following comments: a) there is no reliable testimony to show that this actually happened but even if it did, it is known that patients who have intractable nausea induce vomiting because it makes them feel better. b) the doctor suggests that the patient suffered from bulimia of which there is no shred of evidence in any of her medical records.

Much of the remainder of Dr. Martin's deposition revolves around Dalynn's 2017 overdose of heroin suggesting that a conclusion can be drawn between the overdose and development of a cardiac arrhythmia based on an inherited condition. This is nonsense. First of all no documentation of arrhythmia is present. Secondly, even IF there was an arrhythmia involved it would have most certainly been caused by severe hypoxia from the documented hypoventilation.

Regarding the opinions set forth by Dr. Ronald Kohr my comments are as follows:

Opinion 1: His comment regarding "without access to potentially relevant medical records" should not be taken lightly. Dalynn's death was purely a clinical progression of medical events of which there is sufficient evidence to determine a cause of death.

Opinion 2: He opines that "the only thing of significance which was not done was admitting blood samples for genetic testing which would have been ideal in the setting of a sudden and unexpected death of a young adult ". Next generation sequencing, or the genetic testing being referred to is restricted to cases of sudden cardiac death where there is a high level of suspicion for a family history of abnormal genes that place some patients at high risk, the purpose of which would be to protect future generations. There was absolutely no role for this type of testing in this case.

Opinion 3: The BUN/creatinine ratio is a measure of dehydration. In this case it was part of the analysis of the vitreous humor. When the ratio is greater than 20:1 it indicates dehydration. Notwithstanding Dr. Martin's incorrect statement that dehydration occurs when the ratio is 10:1, in fact it was 37:1, indicative of severe dehydration.

Opinion 4: I have no comments regarding this section

Opinion 5: I have no comments regarding this section

Opinion 6: The doctor states that "the measured sodium levels could also be used to support a diagnosis of fluid overload". This is true in cases of congestive heart failure, liver disease, adrenal disease or renal disease requiring dialysis, none of which apply here. The patient was most certainly clinically dehydrated and a sodium of 132 is completely consistent with isonatremic dehydration as accurately reported by the forensic pathologist. See attached paper for definitions of the various classifications of sodium values.

Opinion 7: The doctor states that "the presence of pulmonary edema is incompatible with dehydration" in fact pulmonary edema is possible in autopsy findings with severe dehydration. Again I have attached a supplemental article with the relevant areas highlighted in yellow.

Opinion 8: The doctor comments that "the diagnosis of isotonic dehydration is not a diagnosis which can be made solely on the basis of autopsy findings as it is a *clinical diagnosis*". I agree with this and point out that my final diagnosis was *not* made solely on the autopsy finding – and is confirmed by the very *clinical diagnosis* he references.

Opinion 9: Regarding vomiting there is good documentation of repeated episodes. By description, not all episodes occurred while the patient was being observed via CCTV. Given the fact that excessive vomiting of any cause can cause dehydration and acute renal failure, coupled with the fact that there is

clear-cut evidence that this occurred, Dr. Kohr's statements of other possibilities appear to obscure what actually happened.

10. The doctor mentions the type of device that Dalynn's aunt had, i.e. "a pacemaker or a defibrillator". This is irrelevant. If it were a pacemaker it could not be used to treat sudden cardiac death. If it were a defibrillator and *even if it did shock the patient*, it would have done so because of acquired heart disease. The notion/conclusion that the presence of either these devices *may* signify congenital conduction disease is totally incorrect here.

Summary:

I hope to have presented a coherent and logical opinion that Dalynn Kee's ultimate demise was completely avoidable and brought about by the following sequence of events: A failure to adequately monitor the decedent while she was on an alternative drug withdrawal program as required by the approved COWS document, a failure to realize that she was undergoing serious withdrawal symptoms of agitation, anorexia and continual vomiting and a failure to take appropriate action by calling for emergency medical help a lot sooner. These inactions resulted in acute renal failure followed by severe hyperkalemia which combined to cause the life threatening arrhythmia that resulted in her death.

The above opinions are my own and predicated on over thirty years in the clinical practice of medicine and cardiology.

Respectfully submitted,

Dr Randolph Martin MD FACC

September 21, 2023