UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| KELSEY JILL SMITH, as Administrator of the Estate of Dalynn Kee, and on behalf of her Next of Kin, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | 20-2203 |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF MACON, ILLINOIS, ANTONIO BROWN, KENNE LARGENT, MICHAEL WHITSEL, TOBY WALTER, DEREK FLAUGHER, JACOB WARRICK, COMMUNITY HEALTH IMPROVEMENT CENTER, INC. D/B/A CROSSING HEALTHCARE, DANA RAY, DENNIS COSTERISAN, LINDA FASICK, KAM DOWDY, AMANDA THOMPSON, CARETH JACOBY, WENDY DIERICKS, AND JAMES ROOT | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## SUMMARY JUDGMENT ORDER

Plaintiff, proceeding by and through counsel, brought the present lawsuit pursuant to 42 U.S.C. § 1983 and state law alleging constitutional and state law violations related to Dalynn Kee's detention at the Macon County Jail. The matter comes before this Court for ruling on the Defendants' Motions for Summary Judgment. (Docs. 115, 116). The motions are granted in part and denied in part.

## PRELIMINARY MATTERS

### Defendants' Motions for Leave to File (Docs. 125, 127)

Defendants seeks leave to file summary judgment reply briefs that exceed the number of pages permitted under local rule. The motions are granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## FACTS

Dalynn Kee ("Kee") died following a ten-day detention at Macon County Jail ("jail"). Plaintiff, in her capacity as the administrator of Kee's estate, brought the following lawsuit alleging that Defendants Community Health Improvement Center, Inc. d/b/a Crossing Healthcare ("Crossing"), Ray, Fasick, Costerisan, Dowdy, Jacoby, and Thompson ("Crossing Defendants," collectively) and Defendants County of Macon ("Macon County"), Macon County Sheriff,[1] Largent, Diericks, Flaugher, Whitsel, Warrick, and Walter ("County Defendants") failed to provide adequate medical care in violation of the Fourteenth Amendment and state law.

Defendant Ray was Crossing's Chief Medical Officer and Medical Director; Defendant Fasick was Crossing's Chief Operating Officer. Crossing UMF 7; Ray Dep. 17:19-21. Crossing

---

[1] Plaintiff sued Defendant Brown, the Macon County Sheriff at the time the lawsuit was filed, in his official capacity only. On December 3, 2021, the Court granted Defendants' motion to substitute Defendant Root, the current Macon County Sheriff, for Defendant Brown pursuant to Fed. R. Civ. P. 25(d). Text Order entered Dec. 3, 2021. Because Plaintiff did not sue Defendants Brown and Root in their individual capacities, the Court refers to these defendants collectively as "Defendant Macon County Sheriff."

employed Defendant Costerisan as a physician, and Defendants Dowdy, Jacoby, and Thompson were nurses. Costerisan Dep. 7:2-6; County UMF 15-18. Defendant Macon County Sheriff employed Defendant Largent as a correctional corporal, and Defendants Diericks, Flaugher, Whitsel, Warrick, and Walter as correctional officers. County UMF 6-11.

### Macon County Jail Medical Care and Operations

A consultant hired to assess medical services offered at the jail in 2017 found several deficiencies in the delivery of medical care by the jail's then-current provider, including the lack of: standard operating procedures to address requests for medical care; practitioners present at the jail; trained medical personnel; and, training provided to non-medical correctional staff. Crossing AMF 145, 151, 153. Following this report, Defendant Macon County solicited proposals from healthcare providers for the provision of medical services at the jail beginning May 1, 2018. Crossing AMF 155.

Defendant Crossing submitted a proposal acknowledging the challenges that providing healthcare in a correctional setting may pose, the serious risks attendant to detainees experiencing alcohol- and drug-related withdrawal symptoms, and the necessity for any provider in a correctional setting have a comprehensive understanding of the standards published by the National Commission on Correctional Healthcare (NCCHC). Crossing AMF 156, 157, 159. Defendant Crossing proposed minimum staffing requirements for on-site and on-call medical services, medical screenings for detainees upon arrival at the jail, and medication-assisted treatment programs to address opioid dependence. Crossing AMF 159.

On May 1, 2018, Defendants Macon County and Macon County Sheriff contracted with Defendant Crossing to provide medical services to detainees at the jail. Crossing AMF 160. The contract required Defendant Crossing, among other things, to provide medical care three times a

week in a clinical setting at the jail by a physician or qualified practitioner under a physician's supervision, sufficient staffing "to effectively manage and operate a medicat[ion] assisted treatment program," and medical staff that had been trained in accordance with the NCCHC. Crossing AMF 161, 163, 164. The agreement also required Defendant Crossing to establish a program for, and provide training to, correctional officers on health-related topics. Crossing AMF 165, 166.

Defendants Macon County and Crossing revised the jail's policies to include an Opioid Withdrawal Protocol ("protocol") that Defendant Ray had developed to address the risks identified above. Crossing AMF 174; (Doc. 115-9 at 20, 23) (Crossing reviewed the jail's policies and updated them to be consistent with the care they were going to provide). The protocol states that "[i]ndividuals on methadone or long-acting opioids may have withdrawal symptoms up to 10 days after their last use," and instructs that detainees detoxifying from these types of substances should be reassessed twice daily for 7-10 days after the last use. (Doc. 116-21 at 56). Defendant Ray testified that determining the need for treatment under the protocol requires ongoing, individualized assessments, not blind compliance. Ray Dep. 104:9-19; (Doc. 115-9 at 29).

Per the protocol, medical staff performs a Clinical Opioid Withdrawal Scale ("COWS") assessment to measure the presence and severity of certain symptoms—pulse rate, sweating, restlessness, pupil size, bone and joint aches, runny nose or tearing, gastrointestinal distress (including nausea and vomiting), tremors, yawning, anxiety, and irritability. Crossing UMF 23. Each symptom is measured individually on a scale of 0-5, using a checklist that provides direction as to how observations should translate into a particular score. The scores for each symptom are then totaled to obtain an overall score. Overall COWS scores ranging from 5-to-12

indicate mild symptoms; 13-to-24 indicates moderate symptoms; 25-to-36 indicates moderately

severe symptoms; and, a score above 36 indicates severe symptoms. Crossing UMF 24.

If a detainee's COWS score is 5 or greater, the protocol requires a specific medication

regimen. Crossing UMF 26, 27. The regimen entails a tapering dose of Clonidine administered

over the course of nine days (same dose administered three times per day for 3 days, then twice a

day for 3 days, and then once a day for 3 days before stopping the medication); Vistaril (three

times a day for three days for agitation); and, Zofran (three times per day for three days for

nausea). Clonidine is intended to relieve anxiety, sweating, nausea, vomiting, muscle cramps,

and changes in blood pressure and heart rate. Crossing AMF 176. If a detainee's COWS score is

less than 5 after three days, "the patient can be moved out of medical [and] into general

population." (Doc. 116-21 at 56). If the COWS score remains elevated at that time, "the nurse

should contact the provider for orders to continue the protocol." *Id.*

Defendant Costerisan was not familiar with the protocol in October 2019, and he testified

that he had not received any formal training specific to providing care in a detention facility.

Costerisan Dep. 14:5-20; 20:9-11. He had no training prior to his employment with Defendant

Crossing in treating patients undergoing opioid detoxification and only "limited" training while

so employed. *Id.* 19:14-20:8. He testified that Crossing officials never reviewed with him the

jail's policies and protocols, and that he is unfamiliar with the NCCHC. *Id.* 14:18-20; 23:10-15.

Defendant Dowdy testified that she received no training on how to conduct a COWS

assessment, that the first time she treated opioid withdrawal syndrome was during her

employment with Crossing, and that she received no training related to this condition outside of

information provided on the COWS assessment form. Dowdy Dep. 38:22-24, 45:4-21, 48:2-7.

Defendant Jacoby testified that Defendant Crossing provided copies of the policies for review

and that she received only "on-the-job" training with informal assistance from Defendant Dowdy. Jacoby Dep. 22:3-23:24. Macon County correctional officers never received training regarding opioid withdrawal. County AMF 220.

Nurses were present at the jail between 7 a.m. and 10 p.m., Monday through Friday, and on weekends to pass out medications. Dowdy Dep. 27:15-16. Physicians and other practitioners, if not present at the facility, were on call and available 24 hours a day, seven days a week—Defendant Ray was on-call from October 7-14, 2023, Defendant Costerisan was on call from October 14-21, 2023. Ray Dep. 121:21-122:5 (Doc. 115-9 at 33). On-call medical providers did not have remote access to medical records; they were dependent on the information nurses or correctional officers provided if not present at the facility. Costerisan Dep. 10:14-24. A detainee could request medical care via a written medical request form. Jacoby Dep. 28:15-30:1.

Correctional officers performed routine headcounts and well-being checks during their shifts in their assigned areas. County AMF 162. Well-being checks require a correctional officer to visually observe each detainee and to pay attention to movements, breathing, etc. to verify their health and safety. County AMF 163, 164. As Defendant Largent put it, "[m]ake sure no one is hanging or passed out, you know, big, bloody pool underneath them, et cetera." Largent Dep. 32:10-12. Medical staff may order well-being checks at 15-minute intervals if circumstances require. *Id.* 35:2-9.

### Kee's Medical Treatment

Kee arrived at the jail on October 7, 2019, following an arrest on an outstanding warrant. Crossing UMF 46. Kee told a non-defendant correctional officer during an initial assessment conducted shortly thereafter that she had been participating in a medication-assisted treatment program for opioid use disorder through a clinic in Springfield, Illinois, and that the treatment

included a prescription for methadone. Crossing UMF 51. She advised that she was currently detoxifying from alcohol in addition to the methadone, and that ceasing use of these substances caused her to experience withdrawal symptoms that included "occasional blackouts." Crossing UMF 49. Known complications associated with methadone withdrawal include anxiety, insomnia, cold, sweats, nausea, vomiting, diarrhea, increased heart rate and changes in blood pressure. Crossing AMF 171, 172. The correctional officer alerted medical staff that Plaintiff had reported prior opioid use and withdrawal symptoms. Crossing UMF 54.

Defendant Ray testified that medical staff would have continued Plaintiff's methadone treatment if the clinic in Springfield would have been willing to provide it. Ray Dep. 63:11-19, 65:3-9 (Doc. 115-9 at 18-19). The medical records indicate that Defendant Jacoby confirmed through the Springfield clinic that they would not do so because the clinic was "unable to transfer patients while incarcerated." Crossing UMF 55; (Doc. 116-24 at 28). Defendant Dowdy also confirmed on October 8, 2019, that the clinic had last administered methadone to Plaintiff on October 5, 2019, and that the clinic had "inherited [Kee] at a dose of 208mg/day." Crossing UMF 57; (Doc. 116-24 at 28).

Defendant Ray directed Defendant Dowdy on October 8, 2019, to start Kee on the protocol. Crossing UMF 58. Defendant Ray advised at the time that Plaintiff "may possibly need 7-10 days," which she testified was "letting [medical staff] know that I may modify the protocol based on that patient." (Doc. 116-24 at 28); Ray Dep. 145:7-9; (Doc. 115-9 at 39).

From October 8th through the morning of October 11th, Kee's overall COWS scores ranged from 9-12; her overall scores from the evening of October 11th, through the next day ranged from 4-6; and, on October 13th, at 11:38 a.m., Kee's overall score was three. Crossing

UMF 61-63, 65, 67, 69, 72, 73, 75, 78, 80, 82, 84. Medical staff also recorded Kee's vital signs at or near the time they conducted these assessments. (Doc. 116-24 at 3).

On October 10, 2019, Kee submitted a medical request stating that she had anxiety and trouble sleeping to which Defendant Dowdy responded that Kee would not receive any other medications until she completed the protocol, that the jail did not treat insomnia, and that she could discuss issues at her intake physical.[2] County UMF 29, 30. On October 11, 2019, Kee submitted another medical request stating that she was not ready to taper down on medications— Defendant Ray responded that Kee would remain on the protocol "as is." County UMF 31, 32. The medication administration reports (MAR) indicate that Kee received all prescribed doses of the protocol medications during this time, except for evening doses of Clonidine on October 8 and 13, 2019, respectively. (Doc. 116-24 at 36-37).

Defendant Jacoby noted in Kee's medical records on October 13, 2019, that Kee's total COWS score was 3 and that Kee was "[s]till complaining about not being able to sleep and anxiety, those will need to be addressed at intake physical." *Id.* at 28. Defendant Jacoby canceled the two COWS assessments scheduled for later that day. *Id.* at 24 (COWS assessments scheduled for 1300 (1:00 p.m.) and 1900 (7:00 p.m.)). She testified that the protocol permitted her to discontinue the associated medications and assessments without a physician's approval if a detainee's COWS score dropped "under a certain number." Jacoby Dep. 132:25-133:1; 135:22-136:6.

Kee did not receive any protocol medications after October 13, 2019. (Doc. 116-24 at 17, 36). Defendant Dowdy canceled the remainder of Kee's scheduled COWS assessments the next day, and medical staff did not take Plaintiff's vital signs at any time thereafter. *Id.* at 3, 25-27

---

[2] Records indicate that Kee had an intake physical scheduled for October 18, 2019. (Doc. 116-24 at 27).

(vital signs taken and COWS assessments scheduled for October 14-15, 2019). Defendant Ray did not order medical staff to stop protocol treatment. Crossing UMF 87.

On October 14, 2019, correctional officers moved Kee to a different housing unit after detainees told them that Kee had twice vomited after sticking her fingers down her throat, and that they were upset because she would not clean it up. Crossing UMF 89, 90, 91. Kee submitted a request on October 14, 2019, stating that she had "puked." County UMF 33. The parties dispute whether Defendant Dowdy notified a provider about this request. (Doc. 120 at 20-21).

On October 16, 2019, Kee told Defendant Diericks that she could not keep anything down, and that she had been vomiting all day. Crossing UMF 94. Defendant Diericks relayed this information to Defendant Thompson, who initially told her that Kee should address these concerns via a medical request. County UMF 37, 38. Defendant Thompson later recommended Kee's transfer to the medical unit for observation after surveillance video disclosed that Kee had not eaten anything that day and that she had refused all three meal trays. Crossing UMF 97; County UMF 39. Officials transferred Kee to medical cell 2 at 8:15 p.m. County UMF 41.

Defendant Costerisan ordered one tablet of Zofran after Defendant Thompson reported to him that Kee had been vomiting. Crossing UMF 99. Defendant Costerisan does not recall the contents of any conversation he had regarding Kee, but he testified that his routine practice would have been "asking questions, you know, how's she doing…why are they calling me…vital signs…does she have urination between [the times she vomited]…So I would have asked some questions about her condition." Costerisan Dep. 71:15-22. With a patient losing fluids, dehydration would be a concern. *Id.* 71:24-72:2. Defendant Thompson gave Kee the medication shortly thereafter and recorded it in Kee's medical chart. (Doc. 116-24 at 28).

The medical unit is situated either within or adjacent to "Trod 2," a housing unit that includes three separate housing pods (A, B, C). County UMF 42; Pl. Resp. to County UMF 42. Video cameras in the medical observation cells permit correctional officers and medical staff to view live feeds of the detainees housed therein. County UMF 44. Two nurse desks, each with computer monitors capable of viewing the live feed of the medical cells, are located within a few feet of the door to medical cell 2. County AMF 172, 175.

The record is not clear whether medical staff or correctional officers had primary responsibility for monitoring detainees housed in medical cells for observation. Defendant Ray testified that she expected "the nurses to have increased observation of what's going on with the patient." Ray Dep. 90:14-16 (Doc. 115-9 at 25). Defendant Jacoby testified that correctional officers would monitor detainees so housed with nursing staff providing additional observation only "in some sense." Jacoby Dep. 89:1-8. Defendant Costerisan did not know "what [the nursing staff's] regulations or requirements were as far as observation or observing [detainees in medical cells.]" Costerisan Dep. 29:19-21.

The jail's practice was for officers assigned to Trod 2 to have visible on their computer screens the video feeds from all occupied medical cells. Largent Dep. 26:4-16. The correctional officer assigned to Trod 2 is also responsible for conducting headcounts and well-being checks in the housing pods and the medical observation cells. Crossing UMF 38, 39.

The logs indicate that correctional officers performed well-being checks at Kee's cell as required during the overnight hours following her transfer to medical cell 2. (Doc. 120-19 at 12-21). The video discloses that Kee vomited or spit into her toilet more than 25 times before medical staff returned the next morning, but the record remains unclear regarding whether correctional officers saw these events on video or communicated this to Defendant Dowdy when

she arrived on October 17, 2019. Crossing AMF 212-44.[3] Defendant Dowdy provided Kee with a pill the parties believe to be Zofran at 7:36 a.m.[4] Crossing UMF 101.

Defendant Dowdy had the video feed of Kee's cell visible on her monitor from 7:45 a.m. through 2:50 p.m., when she turned it off. Pl.'s Ex. 7; Pl.'s Ex. 8. She was seated at her desk with the feeds visible on several occasions when Kee vomited or spit, including two occasions when Plaintiff vomited onto the floor. *Id.* Defendant Dowdy administered an injection of Zofran at approximately 1:00 p.m. per Defendant Costerisan's order and provided commissary items and toilet paper at approximately 2:48 p.m. Crossing UMF 106, 107. Defendant Dowdy did not otherwise look through the window in the door into Kee's cell during her shift, take vital signs, or perform an examination. Pl.'s Ex. 7; Pl.'s Ex. 8. Either medical staff or the correctional officer then assigned to Trod 2 called for a cleanup crew to clean the vomit off Kee's floor that morning. Crossing AMF 263; Jacoby Dep. 106:15-20 (medical or correctional staff can call for a cleanup crew).

Defendant Jacoby arrived at 8:37 a.m. Pl's Ex. 7. She testified that it was not her routine practice to have video feeds of occupied medical cells on her computer screen, and that she did not remember if she had Kee's video feed on her monitor on October 17, 2019. Jacoby Dep. 125:23-126:1, 139:1-4. She authored a medical note at 11:40 a.m. documenting Defendant Costerisan's order for an injection of Zofran, but the record does not disclose that she otherwise

---

[3] The Crossing Defendants argue that the video upon which Plaintiff relies is inconclusive with respect to whether Kee vomited or spit on these occasions and the amount of fluid she lost. (Doc. 126 at 31-32). The Crossing Defendants indicate that they "will allow the Court to draw its own conclusion from viewing those videos." *Id.* at 32. At the very least, the videos disclose a question of fact regarding Kee's actions. Because the Court must view the evidence in the light most favorable to Plaintiff, the Court will accept Plaintiff's characterization that Kee was vomiting during her time in the medical observation cell.

[4] Defendant Dowdy testified that she did not remember which medication she gave to Kee at the time, and the medical records do not disclose an active prescription at that time. Dowdy Dep. 96:9-12. The video discloses that she provided a pill from a blister pack containing four columns with eight pills each, the last column was purple. This is consistent with the packaging from which Defendant Thompson obtained Zofran the night. *Compare* Pl.'s Ex. 6 at 08:16:30 PM., *with* Pl.'s Ex. 30 at 07:36:36 AM.

provided medical care or observation before she observed Kee to be unresponsive. Crossing UMF 105; (Doc. 116-24 at 28).

Defendant Whitsel was the correctional officer assigned to Trod 2 beginning at 2:30 p.m. on October 17, 2019. Crossing UMF 108. The logs disclose that he conducted the headcount required at the beginning of his shift and well-being checks of housing pods A, B, and C, and medical cells 1 and 2, in that order, at 30-minute intervals thereafter. (Doc. 120-19 at 25-26). Defendant Whitsel testified that if he is not conducting a headcount or well-being checks, he spends the "majority" of his shift at his station viewing the monitors. Whitsel Dep. 98:25-99:4.

Defendant Whitsel does not recall if he saw Kee vomiting via video on October 17, 2019. *Id.* 108:25-109:4. He was not conducting well-being checks or headcounts on at least five occasions, between the start of his shift and 5:00 p.m., where the video shows Kee vomiting or removing her shirt. County AMF 186, 187, 189, 190; Crossing AMF 289, 293; Pl.'s Ex. 18 at 02:39:13 PM-04:10:59 PM; Pl.'s Ex. 22 at 04:10:59 PM-05:00:00 PM; (Doc. 120-19 at 25-26). Defendant Flaugher testified that Defendant Whitsel told him during a phone call between 3:30-4:00 p.m. that he had a detainee in his trod that was vomiting; Defendant Flaugher told him to make that detainee a priority. Flaugher Dep. 55:3-58:2.

Defendant Whitsel testified that he saw vomit on Kee's bed via video at approximately 4:14 p.m., and that he would have reported to medical staff when Kee vomited onto the floor at 4:27 p.m., had he seen it. Whitsel Dep. 71:23-73:19. The video shows that vomit was clearly visible on the floor when Defendant Whitsel conducted his well-being check at 5:01 p.m. and every 30 minutes thereafter. Pl.'s Ex. 22 at 05:00:00 PM-06:22:00 PM. Defendant Whitsel did not notify medical staff. Whitsel Dep. 73:16-19. No cleanup crews arrived. Pl.'s Ex. 22 at 05:00:00 PM-06:22:00 PM.

The video shows Kee stumbling around her cell at 5:15 p.m., eventually falling to the floor. Pl.'s Ex. 22 at 05:15:00 PM-05:17:00 PM. Defendant Whitsel testified that he observed Kee on the floor via video at some point during this time, and, that when he delivered dinner three minutes later, he noticed Kee's hands were cramping. Whitsel Dep. 75:20-77:12. Defendant Whitsel and another correctional officer directed Kee to go back to her bed. County UMF 73. As Kee complied, the video shows her visibly fall into the side of the toilet before regaining her balance. County UMF 74; Pl.'s Ex. 22 at 05:17:00 PM-05:20:00 PM. Her vomit was still on the floor. *Id.* Defendant Jacoby wheeled her chair to the entrance of Kee's cell and appears to look inside at this time. County UMF 72; Pl.'s Ex. 8 at 05:17:00 PM-05:20:00 PM. She told Illinois State Police investigators that she saw Kee alive around this time, but she testified that she does not recall what she saw. (Doc. 122-21 at 24); Jacoby Dep. 123:24-124:2.

At 5:41 p.m., Kee lost control of her body while filling up a bottle at the sink. Pl.'s Ex. 22 at 05:41:00 PM-05:43:59. She fell to her right, causing her to trip over the toilet and violently slam the back of her head on the concrete floor, where she remained motionless, eventually crawling back to her bed. *Id.* Kee fell off the bed at 5:47 p.m., landing face down on the ground with her lower body still on the bed. *Id.* at 05:47:00 PM-05:48:59 PM. Defendant Whitsel was not conducting well-being checks during this time. (Doc. 120-19 at 26).

At 5:55 p.m., Kee takes off her pants and lies in the fetal position with a towel between her legs and no blanket, leaving her bare lower body exposed. Pl.'s Ex. 22 at 05:55:00 PM-05:06:00 PM. Defendant Whitsel conducted a well-being check on her cell, lasting 1-2 seconds, at 5:56 p.m. (Doc. 120-19 at 26). At 6:01 p.m., Kee rolled onto her back, exposing her vagina. Pl.'s Ex. 22 at 06:00:00 PM-06:02:00 PM. She did not move again.

Defendant Whitsel noticed Kee's nudity on the video at 6:12 p.m. County UMF 77. Kee did not respond to his commands to put her pants back on. County UMF 78, 79. After Kee failed to respond a second time at 6:19 p.m., Defendant Whitsel notified Defendant Largent, who told him to document it. County UMF 81, 82, 84. At 6:22 p.m., Defendant Whitsel conducted an admittedly brief well-being check because he did not want to violate the Prison Rape Elimination Act. Whitsel Dep. 95:2-7. He testified that he saw Kee's chest rise at that time. *Id.* 95:23-25. Defendant Whitsel went on his meal break at 6:30 p.m.; he advised Defendant Walter that Kee was not wearing pants, that she had not responded to his commands, and that Defendant Largent was aware. County UMF 86.

Defendant Jacoby called an emergency over the radio at 6:35 p.m., upon looking into Kee's cell and noticing she was not responsive. County UMF 87. Defendants Diericks, Flaugher, Warrick, and Walter responded to the call and began administering CPR, ceding to emergency medical technicians upon their arrival. County UMF 88-92. The EMTs transported Kee to the emergency room where she was pronounced dead at 7:10 p.m. County UMF 100. The autopsy stated that Kee's cause of death was "isonatremic dehydration due to opioid withdrawal." (Doc. 122-29).

## ANALYSIS

The County Defendants move for summary judgment on all claims against them. The Crossing Defendants move for summary judgment on Count I (Fourteenth Amendment claim alleging inadequate medical care) and Count III (Fourteenth Amendment claim brought pursuant to *Monell v. Dep't of Social Srvcs. of City of New York*, 436 U.S. 658 (1978)). The Crossing Defendants do not move for summary judgment on Plaintiff's state law claims.

**Count I**

Plaintiff asserts a Fourteenth Amendment claim against Defendants Largent, Diericks, Flaugher, Whitsel, Warrick, Walter, Ray, Costerisan, Thompson, Dowdy, and Jacoby for failure to provide adequate medical care.

Detainees have a right to adequate medical care under the Due Process Clause of the Fourteenth Amendment. *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). To prevail, Plaintiff must show that an official's deliberate or reckless conduct was objectively unreasonable. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352-53 (7th Cir. 2018). Specifically, a plaintiff must show that (1) he suffered from an objectively serious medical condition; and (2) that the officials' responses to it were objectively unreasonable. *Williams v. Ortiz*, 937 F.3d 936, 942-943 (7th Cir. 2019). The parties do not dispute that Plaintiff suffered from an objectively serious medical need.

The objective reasonableness inquiry "requires courts to focus on the totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 888 (7th Cir. 2018). Liability attaches only where the official "acted purposefully, knowingly, or perhaps even recklessly" when taking the actions at issue—negligence, or even gross negligence, will not suffice. *Miranda*, 900 F.3d at 352-53.

Courts defer to the expertise of the medical professionals who provided treatment. A medical professional's treatment decision is "presumptively valid" and, to prevail, the plaintiff must show that "the decision by the professional is such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible actually

did not base the decision on such a judgment." *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir.

2019) (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). A treatment decision is

objectively unreasonable only if the evidence suggests that "no minimally competent

professional would have so responded under those circumstances." *Id.*

 "Section 1983 creates a cause of action based on personal liability and predicated upon

fault; thus, liability does not attach unless the individual defendant caused or participated in a

constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Plaintiff,

accordingly, cannot hold officials responsible for the acts of their subordinates, nor can she

prevail by showing that a particular officials failed to perform duties not assigned. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 676 (2009) (no *respondeat superior* liability under § 1983); *Burks v.*

*Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[N]o prisoner is entitled to insist that one

employee do another's job."). "[A] violation of a jail policy is not a constitutional violation

enforceable under 42 U.S.C. § 1983." *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

### *Crossing Defendants*

Defendant Ray ordered medical staff to provide treatment to Kee pursuant to the protocol

shortly after Kee arrived at the jail. Nothing in the record suggests that this decision lacked the

requisite medical judgment, and the information available to a reasonable official in Defendant

Ray's position on October 11, 2019, does not permit a reasonable inference that the decision to

continue the protocol "as is" was objectively unreasonable. The record does not disclose that

Defendant Ray was involved in any further decisions related to Kee's treatment, and the parties

agree that she did not order medical staff to stop protocol treatment at any time.

The record does not disclose that Defendant Ray's decision to continue Kee's protocol

treatment was likely to cause harm, and, absent such evidence, Defendants Dowdy and Jacoby

were required to follow through on Defendant Ray's directions. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurses must "defer to treating physicians' instructions and orders in most situations . . . [unless] it is apparent that the physician's order will likely harm the patient."); *Reck v. Wexford Health Sources*, 27 F.4th 473, 485-86 (7th Cir. 2022). They nonetheless canceled Plaintiff's remaining COWS assessments and protocol medications two days later without consulting a physician, apparently because Defendant Jacoby believed the protocol required it.

A reasonable official in their positions on October 17, 2019, would have known that Kee had not completed the protocol as ordered, that Kee had reported known symptoms of methadone withdrawal (anxiety, insomnia, vomiting) near or after the time they discontinued the protocol, and that Kee's vomiting had not subsided despite three doses of anti-nausea medication. Plaintiff's expert indicates that a reasonable nurse under these circumstances would have recognized the risks of dehydration attendant to persistent vomiting and the need for increased observation, (Doc. 122-19 at 9-10), and a triable issue of fact exists regarding the level of observation these defendants provided despite knowledge of Kee's condition.

Unresolved factual questions remain regarding the information nurses provided to Defendant Costerisan and what steps, if any, he took in addition to ordering medication to address Kee's vomiting and the attendant risk of dehydration. At the very least, a reasonable official in his position would have known that Kee had been vomiting persistently over approximately 16 hours and that medication to address the issue had not been effective, and that the fluid loss posed a risk of dehydration. The question of whether Defendant Costerisan followed his routine practice requires a credibility determination reserved for the trier of fact. Viewed in the light most favorable to Plaintiff, the record supports a reasonable inference that

Defendants Dowdy's, Jacoby's, and Costerisan's decisions lacked the requisite exercise of professional judgment.

### County Defendants

Non-medical jail officials may be held liable if they prevent access to medical treatment or interfere with treatment once prescribed. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). They have a constitutional obligation to make reasonable efforts to facilitate medical treatment for confined individuals in obvious distress. *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015) ("If a prisoner is writhing in agony, the guard…has to make some effort to find a doctor, or…some medical professional."). Jail officials that do so may appropriately defer to the expertise of treating medical staff without fear of liability, *McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022), unless the official has "reason to know that their medical staff were failing to treat or inadequately treating an inmate." *Miranda*, 900 F.3d at 343.

Defendants Flaugher and Warrick were not assigned to Trod 2, and they were not involved until Defendant Jacoby called the emergency over the radio. Defendant Whitsel did not inform Defendants Largent and Walter of any issues until after the time Plaintiff asserts Kee had died. No reasonable inference arises that Defendants Flaugher, Warrick, Largent, or Walter was personally involved in any constitutional deprivation. The record also does not permit a reasonable inference that Defendant Diericks' decision to inform medical staff that Kee had reported vomiting was objectively unreasonable, and she was entitled to defer to Defendant Thompson's decisions on October 16, 2019. *Miranda*, 900 F.3d at 343 ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention."). The Court finds that no reasonable juror could conclude

that Defendants Flaugher, Warrick, Largent, Walter, and Diericks violated Kee's constitutional rights.

Viewed in the light most favorable to Plaintiff, the record discloses that a reasonable officer in Defendant Whitsel's position would have had both the opportunity and means to observe Kee's persistent vomiting and other physical distress over the course of several hours. If the trier of fact credits Defendant Whitsel's testimony that he would have been watching the monitors when not engaged in headcounts or well-being checks and Defendant Flaugher's testimony that Defendant Whitsel had called him about a vomiting detainee, sufficient evidence exists for the trier of fact to find that his decisions not to notify medical staff were objectively unreasonable. The questions surrounding the primary responsibility to observe detainees in a medical observation cell precludes a finding that Kee's presence in the cell, on its own, permitted a reasonable official to defer to medical staff.

### *Qualified Immunity*

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations and citations omitted).

To determine whether qualified immunity applies, courts conduct a two-prong analysis: (1) whether the official's conduct as alleged or shown violates a constitutional right; and (2) whether that right was clearly established at the time of the alleged conduct. *Id.* at 232. Courts may decide which prong to address first. *Id.* at 236. The plaintiff bears the burden of defeating a qualified immunity defense. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021).

A right is clearly established "where it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 620 (7th Cir. 2022) (citations omitted). A plaintiff may establish a right is clearly established by: (1) identifying a "closely analogous case finding the alleged violation unlawful;" (2) identifying in the relevant case law "such a clear trend…that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time;" or showing that the conduct at issue was "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Id.* at 620-21. District courts cannot define clearly established law at a high level of generality," but must decide "whether the violative nature of the particular conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015).

The Court need not discuss qualified immunity as it relates to Defendants Flaugher, Warrick, Largent, Walter, and Diericks given its findings that these defendants are not constitutionally liable. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 569 (7th Cir. 2021). Qualified immunity is not a viable defense for Defendants Costerisan, Dowdy, or Jacoby. *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017) (private medical contractors are not entitled to qualified immunity).

As discussed above, the law was clearly established in 2019 that non-medical jail officials may not ignore a detainee in obvious distress, and, if the detainee is under the care of medical professionals, deference to those officials is appropriate unless the official has reason to believe that the detainee is not receiving treatment or that the treatment is clearly inadequate. The question of whether Defendant Whitsel violated Kee's constitutional rights turns on resolution of the factual disputes identified above, thus precluding a ruling on whether Defendant Whitsel is

entitled to qualified immunity at this stage. *Ferguson v. McDonough*, 13 F.4th 574, 584 (7th Cir. 2021).

### Counts II and III

Plaintiff asserts claims pursuant to *Monell v. Dep't of Social Srvcs. of City of New York*, 436 U.S. 658 (1978) against Defendants Macon County Sheriff, Defendant Largent in his official capacity, Macon County, Crossing, and Defendants Ray and Fasick in their official capacities.

Count II of Plaintiff's Complaint alleges that Defendants Macon County and Macon County Sheriff:

a. failed to ensure through proper training, supervision and discipline of corrections staff or termination of medical staff that corrections staff and medical staff complied with established policies, practices and procedures for addressing the serious medical needs of inmates at MCJ, such as Dalynn, who are undergoing detoxification from opioids, including her lawfully prescribed methadone;

b. acquiesced in the widespread practice and/or office policy at MCJ for corrections officers or medical staff to not contact on call medical providers or call for emergency medical services on behalf of an inmate experiencing an obvious medical emergency;

c. failed to ensure through training, supervision and discipline of corrections staff or termination of medical staff that corrections staff and medical staff adequately communicate and document an inmate's deteriorating medical health conditions;

d. failed to ensure, through training supervision and discipline of corrections staff and termination of medical staff, that corrections staff and medical staff properly respond to an inmate's deteriorating medical health conditions;

e. failed to contract for healthcare services in a manner that financial incentives would not affect reasonable medical judgment, and deter medical corrections staff or medical staff from calling on-call healthcare providers, requesting on-call providers to return to the facility after hours for medical emergencies, or for calling outside noncontract emergency services; and

f. failed to provide or otherwise effectively manage a medication assistance treatment program for inmates at MCJ, such as Dalynn, who are undergoing detoxification from opioids, including her lawfully prescribed methadone.

(Doc. 1 at 34-36). Count III alleges that Defendant Crossing:

a. failed to ensure through proper training, supervision and discipline that the individual corrections staff and medical staff complied with established policies, practices and procedures for addressing the serious medical needs of inmates at MCJ, such as Dalynn, who are undergoing detoxification from opioids, including her lawfully prescribed methadone;

b. acquiesced in the widespread practice and/or office policy at MCJ for corrections officers or medical staff to not contact on call medical providers or call for emergency medical services on behalf of an inmate experiencing an obvious medical emergency;

c. failed to adequately monitor the deteriorating medical health of inmates;

d. failed to ensure, through training supervision and discipline of corrections staff or termination of medical, that corrections staff and medical staff adequately communicate and document an inmate's deteriorating medical health conditions;

e. failed to ensure through training supervision and discipline of corrections staff or termination of medical staff, that corrections staff and medical staff properly respond to an inmate's deteriorating medical health conditions;

f. failed to contract for healthcare services in a manner that financial incentives would not affect reasonable medical judgment, and deter medical corrections staff or medical staff from calling on-call healthcare providers, requesting on-call providers to return to the facility after hours for medical emergencies, or for calling outside noncontract emergency services; and

g. failed to train corrections or medical staff or provide staff or otherwise effectively manage a medicated assistance treatment program for inmates at MCJ, such as Dalynn, who are undergoing detoxification from opioids, including Dalynn's lawfully prescribed methadone.

(Doc. 1 at 36-37).

Local governments are not automatically liable under § 1983 for the unconstitutional conduct of its employees. Under *Monell*, they can be held liable under § 1983 "when execution of the municipality's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy" causes a constitutional deprivation. 436 U.S. at 694. This requires a plaintiff to show (1) an official policy or custom "caused the constitutional injury;" and (2) that "the [official] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [official] action and the

deprivation of federal rights." *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020). In other words, "[t]he plaintiff must…demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). *Monell* liability extends to private contractors who voluntarily assume the municipality's duty to provide medical care. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017)

The first requirement ensures that local governments are "held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality" and not for harm resulting from the unconstitutional acts of its employees. *Id.* at 403-04; *Glisson*, 849 F.3d at 379 ("The critical question…is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). A plaintiff can establish an official policy through "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012).

To impose liability based upon a widespread custom or practice, a plaintiff must allege facts showing that the alleged practices are "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Bridges v. Dart*, 950 F.3d 476, 480 (7th Cir. 2020). There is no bright-line rule defining widespread custom or practice, "but there must be some evidence demonstrating that there is a policy at issue rather than a random event or even a short series of random events." *Id.* at 479. Nor does the law define "how

frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or three." *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010); *Bridges*, 950 F.3d at 480 (five complaints over seven years not enough to show widespread custom or practice) (collecting cases).

Plaintiff does not assert that operation of an express policy violated Kee's constitutional rights, and her argument that officials violated Kee's rights by failing to follow established policies belies any such finding. The record also does not support an inference that the protocol itself failed to adequately address the risks opioid withdrawal presented, or that medical staff routinely failed to effectively manage it.

There is no evidence that financial considerations influenced medical decisions to the point that it constituted a widespread custom or practice, nor is there evidence that cost played a role in Kee's treatment, much less to the point that it resulted in the denial of treatment. *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) ("[C]ost may be, in appropriate circumstances, [a] *permissible factor*[] for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered *to the exclusion of reasonable medical judgment* about inmate health.") (emphasis in original).

The record permits a reasonable inference that the jail had a widespread policy or practice to conduct various checks at specific intervals throughout an officer's shift and to have video feeds visible on the monitors at an officer's station, neither of which could be interpreted as likely to result in a constitutional violation. If officials failed to adopt standard operating procedures to ensure the review of detainee medical requests, the timely responses Kee received to her requests negates an inference that the failure was the moving force behind the deprivations

she suffered. Plaintiff has not presented evidence that medical staff consistently failed to adequately respond to medical issues at the jail.

Plaintiff instead asserts that Defendants should be liable because they failed to act. "[A] failure to act amounts to municipal action for *Monell* purposes only if the [governmental unit] has notice that its program will cause constitutional violations." *J.K.J.*, 960 F.3d at 379. Demonstrating notice is essential and "requires a 'known or obvious' risk that constitutional violations will occur." *Id.* For example, in *J.K.J.*, county had knowledge of material gaps in sexual harassment policy that exposed female inmates to significant risk of sexual abuse. *Id.* In *Woodward v. Correctional Medical Srv. of Ill.*, officials had knowledge that the actual practice jail staff used to screen detainees for suicide risk substantially deviated from written policy and therefore a failure to act amounted to a policy decision. 368 F.3d 917, 927-28 (7th Cir. 2004).

Defendants Macon County and Macon County Sheriff had knowledge that its previous healthcare provider had failed in several respects to deliver adequate medical care. Nothing in the record suggests that they had notice at the time they contracted with Defendant Crossing that the inclusion of several provisions addressing these deficiencies was likely to result in a constitutional violation or that Defendant Crossing would apparently fail to provide adequate training as required under the terms of the contract. Plaintiff has not presented evidence that Defendants Macon County and Macon County Sheriff knew that Defendant Crossing's medical care had substantially deviated from the standard of care Crossing agreed to provide, or that they knew that the failure to provide adequate medical treatment for opioid withdrawal extended beyond Kee's treatment.

*Monell* liability based on a failure to train employees is appropriate only where it reflects a "deliberate" or "conscious" choice not to provide the necessary training. *City of Canton, Ohio*

*v. Harris*, 489 U.S. 378, 389 (1989). This requires a showing a pattern of similar constitutional violations by untrained employees or a policymakers "continued adherence to an approach that they know or should know has failed to prevent tortious conduct." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Plaintiff has not presented evidence showing the requisite pattern of conduct or that Defendants Macon County, Macon County Sheriff, and Crossing had notice that any failure to train would result in a constitutional violation. The record supports an inference that the training Defendants Costerisan, Dowdy, Jacoby, and Whitsel received was lacking, but it is not sufficient to say that Kee's death could have been prevented had they had better or more training specific to the conditions she presented. *Canton*, 489 U.S. at 391.

Plaintiff also argues that summary judgment is not appropriate under a ratification theory. To prevail under this theory, Defendants Macon County, Macon County Sheriff, and Crossing "must approve both the employee's conduct and the basis for that conduct, i.e., the employee's motivation." *Speigel v. McClintic*, 916 F.3d 611, 618 (7th Cir. 2019). The failure to investigate the incident, discipline those responsible, or take other remedial measures does not amount to ratification.

Plaintiff argues that the County and Crossing Defendants' failure to conduct an internal investigation into Kee's death in addition to the Illinois State Police investigation "effectively ratified the conduct at issue." (Doc. 122 at 99). She has not presented any evidence showing that these defendants expressly approved their subordinate's alleged unconstitutional conduct or endorsed the basis for their actions. The Court finds that no reasonable juror could conclude that Defendants Macon County, Macon County Sheriff, Crossing, and Ray, Fasick, and Largent in their official capacities violated Kee's constitutional rights as alleged in Counts II and III.

**Count IV and V**

Plaintiff alleges that the County Defendants violated state law. The County Defendants assert that they are entitled to immunity from these claims under Section 4-105 of the Tort Immunity Act ("Act"). The statute provides:

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

745 Ill. Comp. Stat. § 10/4-105. The Act defines "willful and wanton" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." *Id.* § 10/1-210.

Willful and wanton conduct "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it," a standard the Seventh Circuit has found to be "remarkably similar" to the Eighth Amendment's deliberate indifference standard. *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001); *McDowell v. Village of Lansing*, 763 F.3d 762, 768 (7th Cir. 2014) (willful and wanton conduct as contemplated under the Tort Immunity Act "consists of more than mere inadvertence, incompetence, or unskillfulness.").

The issues of fact identified above preclude a finding that Defendant Whitsel is entitled to immunity under the Act. If the factual issues discussed above are resolved in Plaintiff's favor, the record permits a reasonable inference that Defendant Whitsel had actual knowledge that Kee was in distress, that he knew that medical staff was unaware of her condition or unwilling to help, and that he failed to notify them. This is sufficient to satisfy the willful and wanton and

deliberate indifference standards. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (an official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

The record does not support a finding that Defendants Largent, Flaugher, Diericks, Warrick, and Walter actions were willful and wanton, and, therefore, the Court finds that these defendants are entitled to immunity under the Act.

### Count X

Plaintiff alleges, in part, that the County Defendants are liable under state law for the actions of the Crossing Defendants pursuant to *respondent superior*. "Under the doctrine of *respondeat superior,* a principal may be held liable for the tortious actions of an agent which cause a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff." *Lawlor v. N. Amer. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2012) (quotations and citations omitted). No vicarious liability exists for independent contractors. *Id.*

The County Defendants argue that the Crossing Defendants were not their agents. The question of whether an individual is an agent or independent contractor turns on the facts and circumstances of each case. *Id.* The primary consideration is "whether that person retains the right to control the manner of doing the work." *Id.* Factors for a court to consider include: "(1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done." *Id.* No one factor is conclusive. *Id.* The burden of showing that an individual is an agent lies with the party seeking to impose liability. *Id.*

Defendants Macon County, Macon County Sheriff, and Crossing had a contractual agreement for Crossing to provide healthcare services at the jail. The contract required Defendant Crossing to provide minimum staffing and availability of medical services, and to provide access to qualified medical providers. The record does not support an inference that Defendants Macon County and Macon County Sheriff maintained control over the medical decisions or personnel decisions the Crossing Defendants may have made. Plaintiff points to no evidence that supports the conclusion that an agency relationship existed. The County Defendants' motion is granted to the extent that Plaintiff seeks to hold the County Defendants liable for the Crossing Defendants' actions and denied as to any other relief requested.

### Count XII (County, Indemnification)

Plaintiff alleges in Count XII that Defendants Macon County and Macon County Sheriff are liable for any judgments or settlements for compensatory damages pursuant to the Local Government and Governmental Tort Immunities Act, 745 Ill. Comp. Stat. § 10/9-102. The Act provides: "A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable." *Id.*

The County Defendants argue that, because they are entitled to summary judgment on all of Plaintiff's claims, this count is derivative and should be dismissed. Based on the Court's rulings above, the County Defendants' motion as to this count is denied.

**IT IS THEREFORE ORDERED:**

1) **Defendants' Motions for Leave to File Excess Pages [125][127] are GRANTED.**

2) **The County Defendants' Motion for Summary Judgment [115] is GRANTED as to Plaintiff's claims against Defendants Flaugher, Warrick, Largent, Walter, and Diericks in Count I, Plaintiff's claims against Defendants Macon County and Macon County Sheriff in Count II, Plaintiff's claims against Defendants Largent, Flaugher, Diericks, Warrick, and Walter in Counts IV and V, and Plaintiff's claims in Count**

X as they relate to the Crossing Defendants. The motion is DENIED as to any other relief requested.

3) The Crossing Defendants' Motion for Summary Judgment [116] is GRANTED as to Plaintiff's claims against Defendants Ray and Thompson in Count I, and Plaintiff's claims against Defendant Crossing Healthcare and Defendants Ray and Fasick in their official capacities in Count III. The motion is DENIED as to any other relief requested.

4) Clerk is directed to terminate Defendants Largent, Flaugher, Diericks, Warrick, and Walter.

5) A final pretrial conference is scheduled for   July 17, 2024, at 9:00 a.m.  . Counsel for the parties shall appear in person.

6) The parties are further directed to submit the joint, proposed final pretrial order by   July 5, 2024  .  The proposed pretrial order shall conform in content and form to Local Rule 16.1(E) and Appendix 1 of the local rules of this district. Witness lists shall be redacted and an unredacted list shall be filed separately using the event "Witness List." Jury instructions shall be e-filed in three separately numbered parts: Agreed Instructions, Plaintiff's Instructions (to which Defendant objects), and Defendant's Instructions (to which Plaintiff objects).

7) A jury trial is scheduled for   August 12, 2024   at 9:00 a.m. No writs to issue at this time.

8) The hearings scheduled in this case will be heard at the U.S. District Courthouse in Peoria, IL, located at 100 N.E. Monroe Street, unless the Court later directs otherwise.

Entered this 26th day of March, 2024.


_/s/ Sara Darrow_
SARA DARROW
CHIEF U.S. DISTRICT JUDGE